The next case please. Regents Room 90847, Assembly of Regents Room 90864, City of Morris, Community Landfill Company, and Colleges by Dr. Peter Gromier, and Mark A. LaRosa, v. Illinois Pollution Control Board, and Adelaide, Aurora, and Montgomery. Here, please report. We've been waiting for this. The view down here is a lot different than the view from up there, and I like the view up there a lot better, quite frankly. My name is Peter Gromier, and I represent the City of Morris, who is one of the appellants today in this consolidated appeal. This matter is here today following an enforcement complaint that was filed by the Environmental Protection Agency against the City of Morris. The Illinois Pollution Control Board granted a motion for summary judgment. The board found that as a matter of law, the City of Morris was conducting landfill operations and was required to meet certain financial assurance provisions of the regulations. That was in the amount of approximately $17 million. We're here today reviewing a motion for summary judgment. Your standard of review from the grant of a summary judgment motion is de novo. Now, the $17 million question is, was the Illinois Pollution Control Board correct when they determined, as a matter of law, that the City of Morris was conducting a landfill operation? The state has argued in their brief that this decision should be supported for two reasons. First of all, the state argues that the board was correct that those specific acts that they set forth in their decision constituted conducting a disposal operation. Their second argument relates to us as an owner, per se, being required to post financial assurance regulations. Now, I want you to understand a little bit of the context, very briefly, of this landfill. This is approximately 119 acres. It has been used as a landfill since the 1970s. The city owns the land on which the landfill is constructed. We owned it back then. We still own it. Beginning in 1982, the city entered into a lease to have someone else construct the landfill. You think of a landfill as kind of like a building. You lay a base. You build a foundation. You put some pipes in. You have to build one side and support one side. Then you fill in on another side. You support that side. It's like a building. It's a technical operation. It's very much like running an airport or running a power plant, something along those lines. We entered into a lease with Community Landfill Corporation to do that technical aspect. We were permitted, not permitted, but permitted, got a permit from the state of Illinois as an owner. Community Landfill got a permit as the operator. Why is that a distinction? Well, I think it's a distinction because it is the person who conducts the landfill who needs to be primarily responsible for financial assurance for closure and post-closure costs. It makes sense as a statutory scheme that the person who's out there doing the day-to-day operations, the ones who are going to be out there and doing everything on a day-to-day basis, has to do it right and has to be responsible for it. Because if not, if they don't do it right on a day-to-day basis, they're going to have problems down the road. What does it mean to conduct a landfill? Well, we give you definitions of what an owner is, and we give you a definition of what it means to be an operator. They're also set forth in the regulations. 807-104 defines an operator as a person who conducts a waste disposal operation. The regulations also tell you what an operator does. An operator is required to set forth daily cover. That's 811-106. An operator is required to place waste in a certain manner and at a certain rate. That's 811-107. An operator has to maintain the equipment. That's 811-107-C. The operator has to patrol the facility daily to check for litter accumulations. That's 811-107-K1. Now, I can tell you that the record is devoid of us doing any of that. We don't do those things. And it wasn't argued by the state that we did them, and the board never found that we did them. What did the board find? The board found that we did three or four things that they used to find that we were conducting a landfill operation. Now, what were they? First of all, one, they said Morris financed the operation. Two, that Morris litigated in conjunction with CLC. Three, that Morris profited from the landfill. And four, that Morris treated the leachate. Now, we didn't do any of those things. What do you know if we did any of those? That wouldn't be enough to come under the definition of what it means to conduct a landfill operation. For example, let's look at finance the operation. Well, financing an operation, in and of itself, doesn't mean that you're conducting a landfill. But even then, they never tell us how we financed it. I mean, they make a conclusion. That's not a fact. They base their decision on it as a fact. But it's not a fact. It's a conclusion. They conclude that we financed the landfill. But they don't tell us how. Now, I think the state's going to argue that we financed it because we posted a bond, a bond of some $10 million. It was a performance bond. It was a bond that we agreed to be the principal listed on for assurance that we would continue to treat the leachate, leachate's groundwater runoff. We treat leachate for everybody in the city of Morris, the drugstore, the police department, residents. That's what we do. Under the regulations, a landfill operator is required to contract out for leachate treatment. Now, they could have contracted with anybody. They could have had trucks showing up, and they could have trucked it off to, well, I'll say Aurora because that's where I'm from. Or they could have gone anywhere. But they did. They contracted with us. Well, that makes sense. But that's the only part of the leachate treatment that we really did was we treated leachate like we did for everyone else. Now, there are provisions in that regulations or in the regulations that the board has adopted that say if you're more than 50 percent of what you treat in your municipal waste treatment facility, if more than 50 percent comes from a landfill, then that waste treatment is part of the landfill. Well, in our case, only one half of one percent of what we treated ever came from that landfill. So we didn't finance this operation. I also note on that bond that we posted, you know, it was for $10 million. But it was limited to five years. It also, they paid all of the costs associated with that bond. So we didn't help them out on any of that. It was simply a performance bond. What else did they say? Well, they also said, the board also said that we litigated in conjunction with CLC. Now, it's true, and I'm sure you guys are tired of seeing CLC and City of Morris and the Illinois Pollution Control Board up here in front of you. We have been here before. But it's, you know, I don't think you can be said to conduct a landfill because you're litigating. Now, there's probably some people that would disagree with that. I think they're all the same. But, okay, I think that it was more of a matter of judicial economy. It's like this. This is a consolidated appeal. We filed an appeal. They filed an appeal. We consolidated them together because we have similar issues of fact. And we have similar issues, may have some similar issues of law, although I think they're going to probably beat up on me pretty good. But we also have other cases where we're on the other side of them and where we're less of a plaintiff and they're less of a defendant. I don't think that being listed as a plaintiff makes you conducting a landfill operation. What else did they say? They also concluded that Morris profited from the landfill. Well, okay. It is not unusual for municipalities and local governments to get rents or loyalties for the land that they have leased out where these landfills are constructed. But that doesn't mean that you're operating them. If it is, you're going to have a whole lot of surprise to counties and municipalities in the state of Illinois. And the other matter is that we treated bleaching. Well, I kind of talked to you about how we treat that bleaching and why we do it. The city does it for everyone. But they could have taken it someplace else. We had a separate side agreement to treat that bleaching. Now, the Pollution Control Board goes on to say that the city retained discretion regarding the decisions of the site and that we made some decisions. But they don't tell us what those decisions were and they don't tell us what discretion we had. And I don't see anything in the record that shows that we made any other decisions or did anything. We were the landlord of this landfill. I think kind of recognizing that they got a little weakness here in what they found to justify their decision, they give us the grand sum argument. The grand sum is that the sum of Morris' conduct rises to the level of operations. Well, simply, that argument is if they didn't make any of those others, zero plus zero plus zero plus zero still equals zero. Whatever base you're in. Simply put, since 1982, the operation of the landfill was conducted by CLC and nothing that was before the board established otherwise. The second argument that the state raised, and that is that we were liable per se as an owner of the property. But that's not what their regs say. And they adopt their regs in the state of Illinois. They have public hearings. And if they wanted to make municipalities and local governments responsible for these closure cost assurances, then they could have put them into their regulations. But no, they put it in there. No person shall conduct waste disposal, this is 21D2, in violation of any regulations. No person other than the state of Illinois shall conduct any disposal operations at a municipal landfill unless the person shall have posted performance. The operative words are always conduct. You have one violation here that they found us on. And that is that we conducted a landfill. We did not conduct a landfill. And we are not responsible as owners. I would ask you that you reverse this decision and that you send it back to them. Or in the alternative, grant our cross motion for summary judgment because the facts that have been put forward did not establish that we were conducting a landfill. Thank you. Thank you, Mr. Grometer. And by the way, I can't help but want to mention this. It's unusual to call you Mr. Grometer. But I tried a case once years ago in Tazewell County. And my opponent, opposing attorney, was a retired judge. And the trial judge kept calling him judge in front of the jury. And I said, judge, will you quit calling him judge? I'm not here only as a lawyer. I understand. I'm not sure I'm not too old for this. Okay. That's another issue. Thanks. Mr. LaRose. Good morning, counsels. Your honors may please the court. I want to take, first of all, my name is Mark LaRose. I represent one of the appellant's community landfill company. I may refer to them as CLC. I want to take one of the issues that we argued in our brief off the table right away. In July of 2010, community landfill company's lease for the landfill expired. And we haven't been on the site since then. In the summer and the fall of 2010, we agreed to a series of Grundy County Circuit Court orders, entered by Judge Marcellia, where we agreed to ultimately a preliminary injunction where we wouldn't put any more waste in the landfill. So the issue, that's important for two reasons. The issue that we had raised that the Pollution Control Board didn't have the authority to make that order is now moved. Nobody questions Judge Marcellia's ability and jurisdiction to do that. And it's also important for another reason, because any argument that the state might make that continuing waste disposal in the landfill is somehow threatening the environment just doesn't exist anymore. In fact, no waste has gone in the landfill for several, about a year before July, but now there's an order entered that says that. I want to jump forward, and then I'll move backwards. I want to jump forward to the penalty. In this case, the Pollution Control Board entered a million dollar and some change penalty against CLC. They did that, even though I think in this case the facts will show that that was, that really any penalty would be unreasonable in this case, either against us or the city of Morris. The standard for the penalty is whether, standard for reversal of it was whether it was arbitrary or capricious or unreasonable. And nobody can argue that CLC and the city of Morris didn't act in good faith when they purchased $17 million worth of compliant bonds, when they vetted those bonds by agency counsel, the agency financial assurance director, the agency's permit manager, who with the knowledge that the bonds, that frontier had been removed from the treasury surety list, approved them anyway. And then we exchanged, pursuant to our deal, the $17 million worth of bonds for the significant modification permit, kind of like a closing. The significant modification permit is crucial to this issue and all the issues in this case. Before it was issued, we got $1.4 million in financial assurance. And if we don't accept the SGMAT, we just close the landfill and we spend $1.4 million. Once we get the SGMAT, it ramped everything up exponentially. The closure then went to $17 million because we had to put things in like additional leachate collection, additional separation layer, additional groundwater monitoring wells, an entire gas collection system. All this stuff was expensive. All this stuff had to be paid for. The only way it could be paid for was putting waste in the landfill. For example, at that time, there was 1.4 million cubic yards of waste space available in Parcel A. Times $20, that's $28 a yard, which was the going rate. That's $28 million. Had we continued to have the ability to put the waste in the landfill like everyone expected, we not only would have been able to pay for the $17 million in closure and all the rest of our costs and expenses, but put a little money in my client's pocket. When the EPA, nine months later, we build the cell, go to them for a permit to put waste in, they said, no, you can't do that. The bonds are no good. What? The bonds are no good. You accepted them knowing that the reason why you're saying they're no good existed at that time. They cut the rug out under my client, and under these circumstances, now they want $17 million worth of financial insurance. And to add injury to what I say is an insult, they also want a million-dollar penalty. Not one dollar of which, by the way, will go to the landfill. It goes into the state's general environmental fund, and none of it will come back. Not one dollar will come back to help this landfill. So I think under these circumstances, the police control board said, well, we're giving them a million-dollar penalty based on economic benefit. Economic benefit? This was an economic disaster. My clients lost millions of dollars and now are on the hook for millions of dollars with absolutely no ability to generate income to pay that back. Let me jump forward now to the liability issue. The board held liability on the basis of summary judgment solely on the application of offensive collateral estoppel. If this court will recall, and Judge Litt, you were on the panel at that time, in 2002, the pollution control board held that the bonds were noncompliant with the regulations, even though they were compliant when they were issued and Frontier had come off of the assured treasury list after that. This court affirmed that decision. Offensive collateral estoppel can indeed apply, but it has to be the same parties, the precise facts, and the same issues that were clearly decided in the prior litigation. Well, there's two facts that weren't before either the board or this court in 2002. In 2004, January of 2004, specifically January 24th, agency financial assurance officer Beverly Anderson admitted in a letter to Frontier that, quote, Morris Community Landfill is providing financial assurance for closure and post-closure through three Frontier performance bonds, end quote. You can find that at pages 12 and 13 of our brief. In addition, and probably more importantly, in 2005 and going forward, the state has now made claims against the same $17 million worth of bonds that they claim are noncompliant. Now, the state's going to get up here and argue, I think, because it did in the brief, that there's a difference between compliant bonds and valid bonds. I argue that that's a distinction without a difference, difference without a distinction, whichever way you see it. Because, because, the Bloomington Patrol Board got it right when they identified, this is in their interim order in Appendix 15, when they identified the purpose for financial assurance, and I quote, the purpose for financial assurance is to provide a guarantee to the state that the funds will be available for closure and post-closure care of the landfill if the operator can't do that. Well, if the bonds are valid, which the state admits they are because they're making a claim against them, and there's money available, then how do we not at least satisfy the purpose of the regulation? That case, the state says it's not really a case that's not true. The case against the bonds is pending in the Supreme Court of the State of New York, who oversees insurance disputes. Of course, Frontier has said, we're not going to pay you because you first accepted the bonds and then you rejected them, and we're also not going to pay you because closure activities that are supposed to be occurring, like treatment of the leaching, like covering the landfill, are ongoing as we speak. No one is in default. So, I guess my point is, I don't mean to say I told you so, but eight years ago I predicted that this was going to happen. I said, if you're going to find these bonds to be noncompliant, tell the state to give them back, because they're just going to try and get it both ways, and that's what they've done. They want us to put up $17 million, us and the city jointly and separately put up $17 million in financial insurance, and they want to make a claim against the bonds. Now, the board said, and they'll say, well, you know, you can have an offset and you can have this and have that. How does that work? We're going to go back to the same people who got this whole thing mixed up in the first place and say, hey, you got a few million dollars from Frontier, so make sure that we get a reduction. No, no, no. Right now, the only evidence in the record is to get a $17 million bond because of the economy, it costs you 80% collateral, so $17 million, you've got to come up with $15 million cash. So we put up the $15 million cash if we had it. We don't have $0.15 to be honest with you, but if we had $15 million cash, we put up the $15 million cash and wait for this thing to wind its way through the New York court system, and even at a meager 5%, the $15 million cash costs you $750,000 a year. The better thing, the better thing would be to send this back to the board and say, listen, make an election. Do you want $17 million in financial assurance or do you want to go against the bonds? But you can't do both. Give up the bonds, like I said eight years ago they should do, or give up your claim for the $17 million and go after the bonds, but you shouldn't be able to do both. Can't that election occur once the litigation ends on the bonds? If they prevail, then they can elect. Okay, but in the meantime, I'm still, not me. I understand. The imperial me is still on the hook for $17 million. So why are we paying $17 million if there's money available? We know. Well, typically this court doesn't get involved in telling people how to conduct their business before they approach the bench. Except that in this case, the finding of liability was based on collateral estoppel, based on facts that weren't before this court. How can it be offensive collateral estoppel? And when you take a fresh look at that, like you need to do because the determination and the standard is de novo, you can say, did I know, did I know when I ruled in favor of the state that they indeed were trying to get it both ways? So that's really the point. You're not really telling them what to do. You're saying, guess what? We didn't have these facts in front of us in 02. Now we do. That raises a question. You know, when you tell us the bonds are valid but they're not compliant, again, what does that mean? If they're valid and they can get money from them, we know that the first- Well, they're going to figure out if it's valid in their litigation. Somebody else is going to make that decision. They certainly are. But the first shot across the bow, right when this thing started, right when this thing started, they offered, Frontier offered $400,000, real money to get rid of this case. Now, it's not $17 million, but we'll see. So in conclusion, I respectfully request that this Court reverse the Board's finding on summary judgment and remand to the Board for further consideration of this issue in light of the claim made on the bond and reverse the Board's order imposing any penalty against CLC and, in fact, against the City of Lawrence. Thank you, Your Honor. Thank you, Mr. O'Rourke. There's one there. Thank you. I'm happy the people on the Board were asking that the Court affirm the Pollution Control Board's decision. Since there's a number of issues, I think it might make sense to begin with a quick overview. And I'd briefly like to say a quick word about the standard of review, then address the City's liability and the merits, both as an operator of the landfill and independently as an owner of the landfill. There's a suggestion that it's somehow not fair to hold the City responsible. I'd like to address that. It's contrary to the most basic purposes of the Act, which requires owners and operators to take responsibility for landfill care. Then turning to CLC, I'd like to address their arguments that the penalty was inappropriate. It was a penalty that was not arbitrary, capricious, or unreasonable. It was within the Board's discretion. And the liability issue, we believe, was squarely resolved by this Court's earlier decision in 2002. With respect to the standard of review, the Board's decision should be reviewed deferentially. I'd actually like to correct a statement in our brief. The Act here contains a specific statutory standard that's in Section 41B, and it's against the manifest way of the evidence standard. And that is set forth in our brief, but the brief doesn't take into account the effect of that. And it's our position that because there is a specific statutory standard, then that is the standard, since that's what the legislature provided, that should apply to the ultimate review of the Board's decision. Or alternatively, it should be the clearly erroneous standard, which is addressed in the brief. What it should not be, we feel, is a no standard of review because this is a summary judgment disposition. As the city suggests, that's not the framework that's been applied in these types of administrative review contexts. So with respect to the city's liability for the violations, these are financial assurance regulations that apply to operators and owners of landfills. And each would establish a basis for liability. With respect to operator, the Board determined that the city was an operator along with CLC because of the city's overall substantial involvement in the landfill's operations. And the Board took a broad view of being an operator and rejected the city's narrow view that operator essentially means carrying out day-to-day type disposal functions. And the city's broad view is entirely appropriate. This narrow view is not compelled by the statutory or regulatory language, which has a lot of breadth within it. And it would actually work the purposes of the Act. It's contrary to the liberal construction mandate that's in the Act, contrary to the purpose of the financial assurance requirements. So what the Board did was make this determination that the city was substantially and actively involved in the landfill's operations. And that was supported by the evidence. And the Board appropriately looked at all the circumstances. And the city suggests, well, those factors add up to nothing, but it's appropriate to weigh the factors in combination, which is what the Board did. The city downplays its role with respect to financial backing, but that's an important factor. The city obtained a bond in the amount of $10 million, which was 60 percent of the financial assurance required, and without which the landfill would have had to close down and could not have continued to operate. So there's the city enabling the landfill to operate, and it's doing so for the benefit of the city. Similarly with the litigation history, the city downplays that. But this is not an owner that stood back and said to the lessee, well, you get the operating conditions worked out. Through that litigation, the city took a very aggressive role in determining those operating conditions. That's what the litigation was about. The litigation was about how much financial assurance do we need to operate? Do we need five-day leachate storage or just one-day leachate storage? How quickly do the leachate control devices need to be installed? And then in the other case, whether the frontier bonds were compliant. So this shows a significant involvement in shaping the landfill's operations. The agreement to assume the leachate treatment, that's significant. The treatment and disposal of leachate is an operational function, and it's an important part of operating the landfill. That's a pretty tiny percentage, isn't it? Pardon me? It's a pretty tiny percentage of the leachate, isn't it? It's of the whole amount treated at the publicly-owned treatment works. Yes, it is a small percentage, and it's from this one particular source. But nonetheless, this is a situation where the city is agreeing to provide this function, largely free of charge. And they're agreeing to provide this function for 100 years. It's an extensive commitment. And here they're doing it for the benefit of the city, to continue these operations at the city's own landfill. And that agreement allows CLC to maintain profits because the leachate treatment doesn't cost very much. They're not sending it to somebody other than the city and paying a higher value for that. So it's a partnership. Yes, I'd say that's true. The city suggested, well, the board mentioned decision-making authority, and we can't really find any in the record. I think the decision-making authority comes through in the record in terms of the city's substantial involvement in permitting, which is some of the things I've been talking about. But also, going forward, the city is making numerous decisions that are relative to maintaining the landfill by their own, and that's all operational type of stuff. Part of operating the landfill is maintaining it and taking care of it, and the city has acknowledged that they've hired engineers and they have taken measures for monitoring and testing. And, again, that's all part of the operations. Now, the city suggests, well, that's giving us a disincentive if you're going to make us an operator. But I'd say that's not the case because there are a number of obligations that the city would have under the Act and other state laws and other federal laws that give it every incentive to maintain the landfill, regardless of anything it might have to do with financial assurance. So I think there we also see the city making decisions towards maintenance, taking operator-type functions. So when you look at all of these facts... Well, was one of the facts, you talk about the owner was profiting, you know, the city made a profit or generated some revenue off of this. Mm-hmm. Was that one of the factors they considered? I think that's a thread that goes through here. That wasn't ever an independent factor. Okay. Well, if that's the thread, just like say that they make a profit, well, I mean, what's wrong with making a profit? I mean, in other words, why would an owner... Nothing's wrong with making a profit. Why would an owner ever allow his land to lose? In other words, to keep... You know, the statute talks about owners and operators, different operations. Well, why would an owner, if he wasn't going to make money off the operation, ever give it to somebody else to operate? Does he have to donate it in order to keep from being construed as an operator? No. No. And that wasn't a factor per se. The board really looked at this whole picture of involvement by the city, which showed this very active involvement in many aspects of the landfill's operations. Well, this company, Acme Leachate Treatment, Inc., had treated the leachate from that place, and that also was 2% or whatever, some low percent of their operations, they didn't operate it. If that were the only fact, then perhaps not. Again, I think there is this overall picture, and this here and this here and this here adds up to show a considerable involvement. I'd also like to address the city's suggestion that there was some type of inconsistency with the board's regulatory definitions of owner and operator. That's not the case. There's nothing in the regulations that suggests that there can only be one operator. It's contemplated that there's a co-operator, that a party can become a co-operator through their involvement. So there can be more than one operator. I think it's interesting, actually, that under those regulations, one way that an owner can become an operator is if no one else is operating and retaining the landfill. And Mr. LaRose has said that this lease expired in July of 2010, and CLC is vacating the premises. So I think that that sort of complements this entire operator analysis. So if the owner, if I, if somebody, if you lease your land to have a landfill and the operator vacates it, the owner by default becomes the operator? Well, that's one of the things that the board's regulations provide. One way to be an owner is if, excuse me, one way an operator can become an owner is if no other person is operating or maintaining the landfill. But here, what the board found was that the city was a co-operator of the landfill along with CLC. We could look at it, say, as a practical matter. No other person is operating and maintaining a landfill, which I think reinforces the conclusion that the city is an operator. And we know now CLC is not even on the premises. In fact, one other point on that, CLC no longer has a legal existence. They were dissolved as a corporate entity in May of 2010. I'd like to turn to the owner argument, but I think when you look at the whole picture, there's support here for the conclusion that the city is an operator based on the situation before the board. The owner liability, and that's independent of the operator liability, follows from looking at this relevant statutory and regulatory framework. It's kind of extensive, so I'm going to try to go through it really quickly. Throughout the 1980s, the state and also local governments were exempt from financial assurance requirements. In 1991, there's comprehensive new federal regulations for municipal solid waste landfills. That's what we have. With respect to financial assurance, the fed regs take away the local government exemption, and they provide that the regs apply to owners and operators. And in response to that, the General Assembly enacts a number of statutes, and these include statutes, and these are statutes that say the board should adopt regulations that are identical to the feds, and we're declaring that Illinois intends to have regulations at least as strict as the feds. And then the board goes out and implements these regulations, and to be consistent with the feds, the board takes out the local government exemption, and the board adds throughout the term owner. So they say owner now, where they never did before. Actually, one correction. One regulation that the city mentioned was 807.104. I don't want to get too bogged down in this, but that applies to old landfills, not an issue. We're in the 811 series. Anything from 807 does not apply here. So the board issues these amended regulations, and the board's regulations now apply to owners or operators. And these are the regulations that have that conducting disposal language in them. And the city says, well, that's destructive. It says owner or operator. But just as under the federal scheme, what that means is one or the other must provide financial assurance. The owner and the operator can decide between them who's going to step up and do that in the first instance, but they both retain the obligation, and they're both ultimately liable. And again, the ultimate point here is that the city's reading this conducting disposal language as an additional layer of restriction. That really means an operator. But the statutes all need to be read together, and they need to be read as a whole. And so that's not the intent of the statutes and the rules here. The intent is that consistent with the federal regulations, the financial assurances requirements apply to both owners and operators. And I think the city also suggests that the federal regulations might have this option, owners or operators. But there's no doubt that the federal scheme applies to both. That's clear both from the text, the beginning of the section that talks about financial assurance. And this is in the appendix to both our briefs, I think. It talks about how the requirements in the section apply to owners and operators. In the federal register, this is in my appendix, there's agency commentary that makes it very clear that the financial assurance requirements apply to owners and operators. It's a brief at page 42, corresponding pages 832, 36, 37 of the appendix. I should probably move on. I don't think it's time to paraphrase any more about that. But the idea, and it's said in so many words, is that the regulated community can choose. One or the other can do it in the first instance. But ultimately, they retain the obligation and they're both liable to the state. And that's really what's meant to be caught here. The city suggested this is waived. I think there's two points. I think there's certainly more thorough treatment and discussion of the subject than the people presented below. But I would say it's within the scope of what was raised. Even if it were waived, the board can consider on any basis in the record. We think this is an appropriate argument for the court to do that with because there are no new facts involved at all. And so this is an argument that's put forward by both the people in the board and which we believe the court should consider. That's liability is to owners and operators. There's some suggestion that this really isn't fair, that the state's actually the party who should be obligated for the care and closure of the landfill. And that's simply not the case. It's owners and operators that are responsible for the care and closure, not the state. As a very last resort, the state might determine to make expenditures for the benefit of the public. But that's not for the benefit of owners and operators, not to relieve them from their obligations just because those parties are no longer receiving benefits and it's not costing them money. To turn to CLC, there's a suggestion here that the penalty is unfair. And that's because they say, well, you know, the agency first accepted these bonds, then they were delisted and then we were really stuck. The agency changed its mind. That whole history was all considered by this court in the 2002 decision. And the board, you know, the board heard CLC on this point, took this all into account and did not really find that there were sufficient mitigating circumstances here to reduce this premiums avoided penalty. The evidence before the board included the fact that, you know, 30 other landfills were using frontier bonds at that time. They all got the same violation notices that CLC and the city did. And this was in November of 2000. So it was really shortly after there was this initial approval that the agency realized this shouldn't have been approved. There was a correction. Short term after, there's the correction. 30 other landfills are in the same position. They're using these bonds and they are all somehow able to find and obtain substitute compliant financial assurance. So the board was not required to review this as significantly mitigating. The city, the CLC claims it doesn't have any money. It could evaporate. It doesn't have any money. But that did not somehow require the board to assess a lesser penalty. CLC knew that there were these closure costs out there. Again, this is just not a penalty that can be considered arbitrary, capricious, or unreasonable. It's within the board's discretion. This idea of floating around about some type of double recovery, and that's unfair because the agency's made a claim on the bonds. To be clear, the agency has not realized any money from a claim on the bonds. Any recovery, if there is a recovery on the bonds, it's likely to be very modest, as only $400,000 in bond premiums were ever paid. And that stopped in 2001. And if there were some modest recovery, the board's order expressly provides that any recovery on the bonds would be credited back to CLC. There's also suggestion here that, well, I think this bond's really valid, and this is a new fact, and it wasn't before the court the first time around. Therefore, collateral estoppel shouldn't apply, and we should be allowed to relitigate whether the frontier bonds are compliant. And just as Mr. LaRose predicted, I am going to say that, yes, there is a distinction between a valid bond and a compliant bond. Bonds might be valid for whatever modest recovery they might produce at some point, but they are not compliant with the financial assurance requirements, and that's definitively decided by this court. There's no basis, or I don't think it would be permissible, really, to revisit that. So the fact that the agency's made a claim on the bonds is not a new fact that's relevant to that. The fact that an agency employee sent a letter to Frontier saying the bonds are providing financial assurance does not mean compliant financial assurance. So the penalty and the remedy are, excuse me, the penalty and the liability are, and the remedy, are appropriate. And for the reasons in the briefs and that's discussed today, we ask the court to affirm the board's decision. Thank you. Thank you, Ms. Wunder. Mr. Grometers and Rubato. Please. First of all, to Mr. Louros, he started talking to you about things that are going on right now and happened in 2010. This judgment was entered back in 2006. It was based on the facts that were entered back in 2006, and that's what you've got to consider. Now, the fact that the state jumped up on it, too, and they talked about an engineer. We had an engineer out there to do some due diligence work, but we didn't have an engineer out there to do any operation work. But if you want, we can start bringing in evidence of what we've done since 2006 when the judgment was entered. I don't think that would be an appropriate thing to do. Second of all, Justice Wright, you mentioned that we were in partnership with them. I didn't use that word. They were our lease. We had a lease with them. I am not in partnership with everybody that I had a lease with. Didn't you say you posted the bond, though, and they repaid you for that? They did pay for the premium on that bond, yes. Isn't that a partnership? I don't think it's a partnership. I think it was the terms of the lease. I think that under the terms of the lease, a written contract, it was a— If you hadn't done that, could they have conducted their business? They would have closed it back then. The financial insurance was $1.5 million. We would have closed it. We would have collected on the $1.5 million financial insurance at that time, and we wouldn't be here now. All right. Thank you. But you're right. I did use the word partnership. I just want to make sure you understand. Our position is we're not partners.  Mr. Croninger, can you talk about the ownership issues at counsel? Well, again, the easiest way to talk about ownership is just to look at the statutes and also to remember in a brief you will see that they're going to premise a lot of their argument as to owners being liable based on changes in the federal regulations. Now, here's what the Fed said. They didn't make owners liable. They said, although these proposed requirements would apply to both the municipal waste landfill owner and the operator, only one would be required to demonstrate financial assurance. This is the Federal Registrar. It appears in the state's appendix at page A32. The EPA considered but rejected the option of requiring both the owner and the operator to demonstrate financial insurance, and there's a reason for that. They want the operator to post the financial insurance because they want that operator to have to be sure that he does it or they do it right. Now, I want to cover real quickly the standard of review because you've got to be careful on this. This is a motion for summary judgment. The state, if you're not going to adopt their argument, the state's going to start asking you to do a differential review of a motion for summary judgment for board and agency cases in administrative law. Counsel, you have one minute. What that means is that you're going to review circuit court decisions as due and audible because they're no trial issue with fact, and I know the law as well as they do. But for a state agency, you're going to start saying, well, there's no trial issue with facts, but they know the law better than I do, so I'll listen to what they have to say. I think you need to be real careful of that. You adopt that standard, you're going to guarantee me appellate work for the rest of my life plus 20 years. The bottom line on this whole thing is that in 1982, we transferred the operation of this to CLC by written documents setting forth that they were going to be responsible, and they were going to do the closure costs. We've done nothing, and the board didn't find anything in all their findings. Read that decision. It's in our appendix, page 13, 14. I know you'll look at it. They made conclusions, but they made no findings of how we operated. This decision has to be reversed. And quite frankly, even if you adopted the erroneous standard that she talked about, even if you do that, this is clearly an erroneous decision. And I thank you very much. Thank you. Mr. LaRose, you get the last word. My wife says I use a donkey.  It was never before this court, never before the Pollution Control Board back in 2002. It's a completely different decision. It's a completely different standard. So in this case, we can say, okay, we'll live with, if we have to, the fact that these bonds are noncompliant. But is it really fair, reasonable, because that's the standard, to then pound these guys with another million bucks under the facts of this case? Let me tell you about the 30 landfills that had these bonds. Twenty-nine of them changed. Guess what? We were the only ones that were shut down because the agency wouldn't- Is that beyond what we can consider? Well, excuse me. That's what counsel just argued. She argued that 29 other landfills were able to change. If I promise to ignore her, I will also ignore you on that point. Enough said. Then I have nothing else to say. Have a nice day, and I would hope that your honors would consider this matter carefully and reverse the Pollution Control Board on the issues of summary judgment and the penalty in place. Can you speak to the initial performance bond that I have referred to as part of the partnership? Yes. Well, the initial performance bond was issued in 1996 for $1.4 million. On May 31st- You paid for by? Paid for by CLC. The initial performance bond, 1996, June 14th. Five years. It had to be renewed by June 14th, 2000. I'm sorry, 2001. On May 31st of 2000, in order to get the SIG bond, we had issued three bonds. A renewal of the $1.4 million. That was done May 31st, 2000. You paid for that? We did. Community Landfill Company. A roughly $5.7 million bond issued to Community Landfill Company, paid for by Community Landfill on May 31st. And a $10 million bond issued by the City of Morris, Frontier, paid for by Community Landfill Company. Now, I think Council's right. I'm not so sure that's in a partnership. We agreed with them. We agreed with them that that was what we would do. And that's what we needed to do to continue operating. And if the government would have lived up to its part of the bargain, they'll take these bonds, even though we know that Frontier's been delisted. We'll take these bonds and let you continue to operate. We wouldn't be here today. There would be bonds in place. The landfill would be operating. And there would be plenty of money there to close this landfill. This whole mess is because they got cute and said, put these guys on the hook for $17 million, and then we'll pull the rug out from under them. And that's what they did, and that's why we're here. And that's just not fair. Thank you. With respect to paying for the bond, the CLC paying for the city's bond, it was just part of the contractual arrangement? Exactly right. It would be no different than I ranted my apartment to you and said, you've got to take care of the HVAC. Or pay for the insurance. Or pay for the electricity. Or cut the grass. Thank you. Thank you. All right. This matter will be taken under advisement. Written disposition will be issued.